UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

In re:

SALANDER-O'REILLY GALLERIES, LLC,                    **OPINION AND ORDER**

                                 Debtor.

------------------------------------------------------------------------x

KRAKEN INVESTMENTS LIMITED,

                             Appellant,

      - against -

                                  No. 11-CV-6133 (CS)

ALAN M. JACOBS, in his capacity as the Liquidation
Trustee of the SOG Liquidation Trust,

                             Appellee.

------------------------------------------------------------------------x

Appearances:

David I. Faust, Esq.
Petra v.Z. Davenport, Esq.
Faust Oppenheim LLP
New York, New York
*Counsel for Appellant*

Robert J. Feinstein, Esq.
Ilan D. Scharf, Esq.
Pachulski Stang Ziehl & Jones LLP
New York, New York
*Counsel for Appellee*

Seibel, J.

Before the Court is the appeal of Kraken Investments Limited ("Kraken"), (Doc. 1), filed on September 1, 2011, from an Order of the United States Bankruptcy Court for the Southern District of New York, dated August 1, 2011 (the "Order"), (Bankr. Doc. 990),[1] denying Kraken's motion for relief from the automatic bankruptcy stay to pursue arbitration. For the reasons stated below, the Bankruptcy Court's Order is AFFIRMED.

## I.    **Background**

Kraken is a limited company incorporated in the British Virgin Islands with its principal place of business in Jersey, Channel Islands. (Bankr. Doc. 941 ¶ 4.) Kraken is owned by Dr. Ronald Fuhrer, a citizen and resident of Israel who owns and operates an art gallery there. (*Id.* ¶¶ 1, 4.) Salander-O'Reilly Galleries, LLC ("SOG" or "Debtor"), owned by Lawrence Salander, operated an art gallery in New York City. (Trustee Br. 5.)[2]

### A. **SOG's Loan Agreement and the Consignment of the Botticelli**

On April 14, 2006, SOG entered into a loan agreement (the "Loan Agreement") with First Republic Bank (along with all successors in interest, the "Bank"). (Scharf Decl. Ex. F;[3] Doc. 12 Ex. A.) Pursuant to the Loan Agreement, the Bank would make "advances (each a 'Revolving Loan Advance' or 'Advance' and collectively the 'Revolving Loan'") from time to time from April 14, 2006 up to, but not including, June 30, 2007. (Loan Agreement § 1.1, at 2.)

---

[1]    "Bankr. Doc." refers to documents filed in the Bankruptcy Court for the Southern District of New York under docket number 07-30005.

[2]    "Trustee Br." refers to the Brief of Appellee Alan M. Jacobs, Liquidation Trustee of the SOG Liquidation Trust, in Opposition to the Appeal of Kraken Investments, Ltd. (Doc. 5.) Facts supported by citation to a party's brief are undisputed, not material, and/or included by way of background. It would be more helpful to the Court if all factual references in briefs were supported by citations to the record.

[3]    "Scharf Decl." refers to the Declaration of Ilan D. Scharf in Support of Liquidation Trustee's Opposition to Appeal of Kraken Investments Limited. (Doc. 9.)

At no time could the outstanding principal of the Revolving Loan exceed the lesser of the

"Maximum Borrowing Base" or the "Maximum Revolving Loan Commitment." (*Id.*) The Loan

Agreement set the Maximum Revolving Loan Commitment at $26 million initially and reduced

the amount periodically. (*Id.* § 1.2, at 2.) The Maximum Borrowing Base was tied to SOG's

"Eligible Inventory": "Maximum Borrowing Base shall mean at any time 55% of the lower of

cost . . . or market value of the Borrower's Eligible Inventory." (*Id.*) Eligible Inventory, in turn,

was defined as

> any works of art, including, without limitation, all paintings [and other types of art] (collectively "Artwork") held by the Borrower for sale by the Borrower, which:
>
> . . . .
>
> (b) Are not held by the Borrower on consignment;
>
> . . . .
>
> (d) Are owned absolutely by the Borrower, free and clear of all liens and encumbrances other than those in favor of the Bank;
>
> . . .
>
> (i) Are not subject to any claims regarding . . . ownership . . . ; and
>
> (j) As to which, if requested by the Bank, the Bank has been provided with satisfactory verification and documentation that the Artwork has been cross referenced with the database by the Art Loss Register to confirm that it is not stolen or of questionable ownership.

(*Id.* § 1.4, at 2–3.) The Loan Agreement granted the Bank a security interest in the "Collateral,"

which included all of SOG's "inventory":

> To secure the payment and performance of all Obligations of the Borrower to the Bank, the Borrower hereby grants to the Bank a continuing security interest in the following properties, assets and rights of the Borrower, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto)
> . . . .

-3-

(*Id.* § 6.1(a), at 15.)  SOG, pursuant to the Loan Agreement, represented:

> With respect to the Collateral at the time the Collateral becomes subject to the Bank's security interest, the Borrower represents, warrants and covenants that . . . [t]he Borrower shall be the sole owner, free and clear of all liens, claims, security interests and encumbrances except for Permitted Liens and liens in favor of the Bank, of and fully authorized to sell, transfer, pledge and/or grant a security interest in each and every item of its Collateral.

(*Id.* § 6.2, at 15.)[4]  After execution of the Loan Agreement, the Bank perfected its security interest in the Collateral by, among other things, filing a UCC-1 financing statement.  (Sharf Decl. Ex. G; *see* Trustee Br. 10.)

On May 3, 2006, Kraken and SOG entered into an agreement (the "Consignment Agreement"), (Scharf Decl. Ex. A), whereby Kraken consigned a painting, "Madonna and Child" by Sandro Botticelli (the "Botticelli"), to SOG for one year after receipt of the painting.  (*Id.* ¶ 1.) Under the Agreement, SOG would feature the Botticelli at an exhibition and use its best efforts to sell the painting, the asking price for which would be $9.5 million.  (*Id.* ¶¶ 6, 8.)  If the painting sold, Kraken would receive no less than $8.5 million, and SOG would receive the difference between the actual sale price and Kraken's share.  (*Id.* at ¶ 9.)  The Agreement also referred all disputes between the parties to arbitration in Jersey and stated that Jersey law would control:

> Any disputes between the parties, including any disputes regarding this agreement, will be referred to arbitration.  The sole arbitrator to be appointed will be a former Judge of the Royal Court of Jersey, Channel Islands, with the only competent Court to be the Royal Court of Jersey, Channel Islands.  Jersey, Channel Islands law will apply to this agreement, including the Arbitration (Jersey) Law 1998.

---

[4]  "Permitted Liens" were defined to include a consignor's security interest that secured SOG's obligations to the consignor.  (Loan Agreement § 10.1(ar)(ix), at 46.)  SOG thus represented that it owned the Collateral except to the extent a consignor had created a security interest in it (which, as will be discussed shortly, Kraken did not perfect).

(*Id.* ¶ 11.) Kraken delivered the Botticelli to SOG on May 11, 2006. (Kraken Br. 4.)[5] Kraken

did not file a UCC-1 financing statement registering its interest in the consigned property. (*Id.*)

When the consignment period expired on May 11, 2007, SOG requested a short extension, to

which Kraken agreed. (*Id.*)[6] Thereafter, Kraken requested that SOG return the Botticelli, but

SOG did not return it. (*Id.*; *see* Trustee Br. 7.)

## B. State Court Proceedings and SOG's Bankruptcy

Months before the commencement of SOG's bankruptcy, artists and owners of artwork

sued SOG and its owner in multiple actions asserting, among other things, rights to artwork

consigned to or held by SOG, fraud, and unpaid debts. (Trustee Br. 7.) In one action, *Lennox v.*

*Salander O'Reilly Galleries*, No. 602917/2007, the New York Supreme Court issued a

preliminary injunction which enjoined the disposition of any artwork at SOG's gallery and

prohibited SOG or its agents from accessing the premises except by order of the court. (*Id.*) As

a result of this injunction, SOG closed its gallery on or about October 19, 2007. (*Id.*) On

October 25, 2007, Kraken commenced an action by way of an order to show cause in New York

State Supreme Court, seeking seizure of the Botticelli. (*Id.* at 8.)

On November 1, 2007 (the "Petition Date"), three of SOG's creditors commenced an

involuntary bankruptcy case against SOG under chapter 7 of the Bankruptcy Code, and Kraken's

state court action to seize the Botticelli was automatically stayed pursuant to Section 362 of the

Bankruptcy Code. (*Id.* at 5, 8.) As of the Petition Date, SOG was in possession of more than

four thousand works of art, including the Botticelli. (*Id.* at 5, 8.) On November 9, 2007, SOG's

involuntary case was converted to a voluntary case under chapter 11 of the Bankruptcy Code.

---

[5]    "Kraken Br." refers to the Brief of Kraken Investments Limited as Appellant. (Doc. 5.)

[6]    The Trust represented to the Bankruptcy Court that the Consignment Agreement expired in June 2007. *See*
*In re Salander O'Reilly Galleries (In re SOG)*, 453 B.R. 106, 111 (Bankr. S.D.N.Y. 2011).

(*Id.* at 5, 8.)  After conversion, Mr. Salander ceded control of SOG to a chief restructuring

officer.  (*Id.* at 5.)  On January 3, 2008, the Bankruptcy Court entered an order (the "Debtor-in-

Possession (DIP) Financing Order") that provided that the Bank's pre-petition loan to SOG was

> secured by, among other things, a perfected security interest (the "Prepetition
> Lien") in favor of the Bank in the following properties, assets and rights of the
> Debtor and its bankruptcy estate, or either of them, wherever located, whether
> now owned or hereinafter acquired or arising, and all proceeds and products
> thereof: all personal and fixture property of every kind and nature, including
> without limitation all goods (including inventory, equipment and any accessions
> thereto) . . . .

(Scharf Decl. Ex. H, at 9.)

Due to the large number of potential claims to artwork in SOG's possession, the

Bankruptcy Court entered an order dated March 11, 2008 (the "Protocol Order"), (Scharf Decl.

Ex. D), approving the Protocol,[7] the purpose of which was to "identify all claims against and

interests in all of the Artwork in the Debtor's possession, custody or control, to determine which

Artworks are not property of the Debtor's estate, and to resolve disputed claims to Artwork in a

fair, orderly and efficient manner."  (Protocol 1.)  Under the Protocol, a party (an "Art

Claimant") could "assert that certain Artwork is not property of the Debtor's estate under section

541 of the Bankruptcy Code" because the "Artwork is held by the Debtor . . . on consignment."

(*Id.*)  The Art Clamaint could do so by filing an Art Claims Form[8] by the Art Claims Bar Date of

June 15, 2008.  (Protocol Order 2.)  After the Art Claims Bar Date, a Working Group[9]

---

[7]     The "Protocol" refers to the Protocol for Assertion and Resolution of Claims of Ownership to Artworks in
the Possession, Custody or Control of Salander-O'Reilly Galleries, LLC.  (Scharf Decl. Ex. C.)

[8]     The Art Claims Form is attached to the Protocol contained in Scharf Decl. Ex. C.

[9]     "Working Group" refers to a group made up of (1) a representative of the Debtor, (2) representatives of the
Committee, (3) a person not affiliated with the Committee, Debtor, or the Bank proposed by one or more of the Art
Claimants and approved by the Bankruptcy Court to represent the interests of the Art Claimants, and (4) a
representative of the Bank.  (Protocol 6.)  The "Committee" refers to the Official Committee of Unsecured Creditors
appointed in the Debtor's bankruptcy case.  (*Id.* at 1.)

determined whether each piece of artwork subject to an Art Claim was property of the bankruptcy estate. (Protocol 6.) If a member of the Working Group asserted with a good faith basis that an artwork was part of the bankruptcy estate, the work was labeled as a "Claimed Estate Asset." (*Id.*) An artwork unanimously determined not to be property of the estate – including "Artworks that are subject to perfected consignment agreements in accordance with the UCC by the relevant consignor . . . and Artworks subject to consignment agreements that expired or were terminated in accordance with their terms" – was labeled as a "Non-Estate Asset" and returned to the Art Claimant. (*Id.* at 6-7.) Non-binding mediation was available for disputed Claimed Estate Assets. (*See id.* at 7-9.)

On May 28, 2008, Kraken filed an Art Claim regarding the Botticelli, (Scharf Decl. Ex. E), listing the estimated value of the painting as $9.5 million and Kraken as a consignor. (*Id.* at 3-4.) Pursuant to the Protocol, Kraken took part in mediation, (Kraken Br. 5) – which I assume was the result of the Working Group's classification of the Botticelli as a Claimed Estate Asset – but it ended unsuccessfully. On or about July 17, 2008, Kraken filed a proof of claim in SOG's bankruptcy case for $9.5 million based on Kraken's interest in the Botticelli. (Trustee Br. 9.)

On January 10, 2010, the Bankruptcy Court entered an order (the "Confirmation Order"), (Bankr. Doc. 779), confirming the Third Amended Joint Plan of Liquidation Proposed by Salander-O'Reilly Galleries, LLC, the Official Committee of Unsecured Creditors and First Republic Bank (the "Plan"), (Bankr. Doc. 779-1). The Plan appointed Alan M. Jacobs as the Liquidation Trustee for the Salander-O'Reilly Gallery Liquidation Trust (the "Trust"). (*See* Plan 39.) On December 15, 2010, pursuant to the Plan, the Bank formally transferred its Prepetition Lien in the Botticelli to the Trust. (*See* Scharf Decl. Ex. I.)

After taking part in unsuccessful mediation with the Liquidation Trustee, Kraken moved on January 19, 2011 for relief from the automatic bankruptcy stay, seeking to enter arbitration in Jersey pursuant to the Consignment Agreement. (*See* Kraken Br. 5; Bankr Docs. 938-43.) The question before the Bankruptcy Court was whether Kraken "demonstrated cause for relief from the stay so that it may pursue arbitration pursuant to the Jersey Law Clause";[10] the court did not reach the merits of "whether the Trust has a superior interest in the Botticelli." *In re SOG*, 453 B.R. at 113 n.4. The Bankruptcy Court denied Kraken's motion, holding that Kraken failed to establish cause for relief from the stay for two reasons:

1. Arbitration of whether the Botticelli was property of the estate or property of Kraken would improperly sever an element of the determination required by Kraken's filing a proof of claim – specifically, issues under 11 U.S.C. § 544 (allowing Trustee as hypothetical judicial lien creditor to avoid unperfected security interests and render the creditor unsecured).

2. Other creditors – the Trust as hypothetical judicial lien creditor and as assignee of the Bank – were not parties to the consignment agreement and thus were not bound by it, either with respect to arbitration or the choice of Jersey law.

*Id.* at 118-20.

Kraken raises four issues on appeal:

1. Whether the Bankruptcy Court erred in not applying Federal conflict of law rules, which are applicable in non-diversity actions, to the issue of which law should be used to determine the pre-petition ownership of the Botticelli.

2. Whether the Bankruptcy Court abused its discretion in denying the enforcement of the parties' contractual choice of Jersey law and arbitration clause in the Consignment Agreement and therefore erred in finding that New York law preempts Jersey law in the determination of the pre-petition status of the Botticelli.

---

[10]    Relief from a bankruptcy stay "may be granted after notice and a hearing, among other reasons, 'for cause.' *Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (quoting 11 U.S.C. § 362(d)(1)).

3.   Whether the Bankruptcy Court erred in finding that New York law would not respect the parties' contractual choice of Jersey law.

4.   Whether the Bankruptcy Court erred in its assumption of a valid pre-petition bank lien on the Botticelli, without analysis, when the Bank loan documents on their face disclaim consigned art as collateral.

(Kraken Br. 2-3.)

As a preliminary matter, I do not read the Bankruptcy Court's opinion as indicating that it made a final determination that the Bank had a valid pre-petition lien on the Botticelli. Indeed, the Bankruptcy Court held that determination of whether the Bank's lien is valid is (like the issue whether the bankruptcy estate includes the Botticelli) one unseverable element of the determination of the priority of liens, which the Bankruptcy Court has yet to make. *See In re SOG*, 453 B.R. at 113 n.4, 129. The Bankruptcy Court could, for example, find that the Botticelli was not a part of the bankruptcy estate or that the consignment was not covered by UCC Section 9-319 (to be discussed below). I am not aware that such questions were decided below, and thus I will not address them on appeal. As to the remaining issues, I will first address the Bankruptcy Court's rulings on where the determination of pre-petition ownership should be made – in arbitration or the Bankruptcy Court – and then which forum's law – New York's or Jersey's – should apply.

## II.   **Discussion**

### A.   **Standard of Review**

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges." 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's findings of fact for

clear error and reviews its legal conclusions *de novo*. *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous"). A bankruptcy court's exercise of equitable discretion—such as its determination on a motion to lift the automatic stay—is reviewed for abuse of discretion. *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91 (2d Cir. 2003). "An abuse of discretion may consist of an error of law or a clearly erroneous finding of fact, or a decision that, though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions." *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 145 (2d Cir. 2009) (alteration in original) (citations and internal quotation marks omitted). "[A] bankruptcy court's conclusions with respect to enforcement of [an] arbitration clause raise mixed questions of law and fact," *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006), with factual determinations reviewed for clear error and legal conclusions reviewed *de novo*, *see U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640-41 (2d Cir. 1999).

## B. **The Bankruptcy Court's Denial of Arbitration**

The Bankruptcy Court declined to lift the stay to allow arbitration because the Trustee, asserting rights derived from Bankruptcy Code Section 544 and as assignee of the Bank's Prepetition Lien, was "not a party to the consignment agreement and is not bound" by the arbitration clause. *In re SOG*, 453 B.R. at 127. Moreover, the Bankruptcy Court found that the dispute at issue – essentially, whether the Trustee could avoid an unperfected security interest under Bankruptcy Code Section 544 – was a core bankruptcy matter, *see id.* at 120-22, and that

-10-

for policy reasons resolution should take place in the Bankruptcy Court rather than through

arbitration, *see id.* at 129. In appealing the Bankruptcy Court's denial of arbitration, Kraken

argues that because "the Botticelli was not a pre-petition asset of the Debtor and therefore, is not

and could not have been an asset of the bankruptcy estate," Section 544 of the Bankruptcy Code

is inapplicable,[11] (Kraken Br. 21); determination of whether the Botticelli is property of the

bankruptcy estate is not a core matter (*see id.* at 9-10); and public policy favors arbitration, (*see*

*id.* at 20-22).

Generally, in determining whether to lift the automatic stay, a bankruptcy court must, to

the extent relevant, consider the twelve *Sonnax* factors. *See Sonnax Indus., Inc. v. Tri*

*Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280 (2d Cir. 1990). These

factors are:

> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case; (3)
> whether the other proceeding involves the debtor as a fiduciary; (4) whether a
> specialized tribunal with the necessary expertise has been established to hear the
> cause of action; (5) whether the debtor's insurer has assumed full responsibility
> for defending it; (6) whether the action primarily involves third parties; (7)
> whether litigation in another forum would prejudice the interests of other
> creditors; (8) whether the judgment claim arising from the other action is subject
> to equitable subordination; (9) whether movant's success in the other proceeding
> would result in a judicial lien avoidable by the debtor; (10) the interests of
> judicial economy and the expeditious and economical resolution of litigation;
> (11) whether the parties are ready for trial in the other proceeding; and (12)
> impact of the stay on the parties and the balance of harms.

*Id.* at 1286.

Traditional *Sonnax* balancing does not apply, however, on a motion to lift the automatic

stay to allow arbitration to proceed, although courts do not agree on the extent to which some

*Sonnax* factors are still relevant. *Compare Cardali v. Gentile (In re Cardali)*, No. 10-3531, 2010

---

[11]     The Bankruptcy Court found that determination of whether the Botticelli is part of the bankruptcy estate is "one element" of an action to avoid an unperfected security interest under Section 544. *In re SOG*, 453 B.R. at 120.

WL 4791801, at *4 (Bankr. S.D.N.Y. Nov. 18, 2010) ("Because of the strong federal policy favoring arbitration, the traditional [*Sonnax*] balancing test . . . for seeking relief from the automatic stay does not apply.") *and Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 204 (Bankr. S.D.N.Y. 2002) (on motion to lift stay to compel arbitration "*Sonnax* balancing does not apply, and the strong federal policy favoring arbitration trumps the usual considerations of judicial economy and efficiency which are important factors under *Sonnax*"), *with Cont'l Cas. Co. v. Pfizer, Inc. (In re Quigley Co.)*, 361 B.R. 723, 744 (Bankr. S.D.N.Y. 2007) (in granting stay relief, citing *Sonnax* factors one (complete resolution of the issues), ten (judicial economy), two (lack of interference with bankruptcy case), six (arbitration primarily involved third parties), and four (specialized tribunal)).  Instead, courts undertake a four-part inquiry:  (1) whether the parties agreed to arbitrate; (2) whether the dispute falls within the arbitration clause; (3) if federal statutory claims are raised, whether Congress intended those claims to be arbitrable; and (4) if the court concludes that some but not all of the claims are arbitrable, whether it should stay the non-arbitrable claims pending the conclusion of the arbitration.  *See In re Cardali*, 2010 WL 4791801, at *4-5 (collecting cases); *see also Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (following same steps regarding request to stay proceedings pending arbitration).

"[P]arties are not required to arbitrate when they have not agreed to [do so] . . . ." *Clarendon Nat'l Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 514 (S.D.N.Y. 2001) (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)); *see In re Hagerstown*, 277 B.R. at 203 (disputes involving rights created under the Bankruptcy Code "will often fail the preliminary question of arbitrability because the parties did not agree to arbitrate them").  And even if the dispute is one the parties agreed to arbitrate, a bankruptcy court still has

-12-

the discretion to deny arbitration when it would "conflict with the policy of the Bankruptcy Code that created the right in dispute." *In re Hagerstown Fiber Ltd.*, 277 B.R. at 203; *see, e.g., Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 793-94 (Bankr. S.D.N.Y. 2008) (because trustee's preference avoidance claims not derivative of debtor's rights, and can only be brought by trustee or debtor in possession, who were not party to arbitration agreement, claims not subject to arbitration; court would in any event exercise discretion to deny arbitration if claims were governed by arbitration clause). I first discuss the Bankruptcy Court's ruling that the Trustee was not bound by the arbitration clause, and then its balancing of bankruptcy and arbitration policy, which encompasses the issue of whether the dispute at issue is core, *cf. In re Cardali*, 2010 WL 4791801, at *5-8 (addressing core/non-core distinction under congressional-intent step of four-part inquiry after determining that parties agreed to arbitrate dispute), and relevant *Sonnax* factors.

### 1.  Whether the Trustee is Bound by the Arbitration Clause

Resolution of whether the Trustee is bound by the arbitration clause first requires an explanation of the bankruptcy estate, Section 544, and applicable state law. At the beginning of a bankruptcy case, Section 541 of the Bankruptcy Code creates a bankruptcy estate comprising, in relevant part, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "Whether the debtor has a legal or equitable interest in property such that it becomes 'property of the estate' under section 541 is determined by applicable state law." *Musso v. Ostashko*, 468 F.3d 99, 105 (2d Cir. 2006) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)). Whether a state-law created interest "is included in the property of the debtor's estate is determined by bankruptcy law." *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines)*, 928 F.2d 565, 569 (2d Cir. 1991); *see also In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("State law or other

-13-

applicable non-bankruptcy law normally determines the extent of the debtor's interest in property, absent an overriding federal policy.  Bankruptcy law, on the other hand, determines whether that interest is property of the estate.") (internal citations and quotation marks omitted).

"Section 544 of the Bankruptcy Code gives the trustee in bankruptcy the status of a hypothetical judgment lien creditor."  *Musso*, 468 F.3d at 104 (citing 11 U.S.C. § 544(a)(1)). "The trustee hypothetically extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor."  *Id.*  As with Section 541, under Section 544, "state law is used to determine what the lien creditor's priorities and rights are."  *Robinson v. Howard Bank (In re Kors, Inc.)*, 819 F.2d 19, 22-23 (2d Cir. 1987); *see Vienna Park Props. v. United Postal Sav. Ass'n (In re Vienna Park Props.)*, 976 F.2d 106, 115 (2d Cir. 1992) (looking to law of Virginia, site of transaction). "Section 544[] thus puts the trustee in the position of an ideal lien creditor, armed with a judgment and with all the power that state law confers on such ideal creditors."  *Musso*, 468 F.3d at 105.  That trustee "may avoid an unperfected security interest."  *Cal. Chieftan v. Air Vt., Inc. (In re Air Vt., Inc.)*, 761 F.2d 130, 131 (2d Cir. 1985).

As an example, under the New York Uniform Commercial Code (the "UCC"), a creditor could obtain a security interest in a consigned item senior to that of a consignee who does not file a financing statement.  *See* N.Y. U.C.C. § 9-319 cmt. 2 (example 1).[12]  The law operates as

---

[12]  UCC Section 9-319 provides:

(a) Consignee has consignor's rights. Except as otherwise provided in subsection (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer.

(b) Applicability of other law. For purposes of determining the rights of a creditor of a consignee, law other than this article determines the rights and title of a consignee while goods are in the consignee's possession if, under this part, a perfected security interest held by the consignor would have priority over the rights of the creditor.

follows: a consignor delivers goods to a consignee/debtor, but does not file a financing statement, and thus the consignor's security interest is unperfected.[13] The debtor then grants a security interest in the consigned item to a creditor, who perfects it by filing a proper financing statement. Under the UCC, "for purposes of determining the rights of creditors of . . . a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." N.Y. U.C.C. § 9-319(a).[14] Thus, the debtor is deemed to have acquired the consignor's rights to allow a security interest to attach to the consigned item; the consignee's creditor's security interest attaches to that item and is perfected by the filing of its financing statement; and the creditor's rights are senior to the consignee's unperfected security interest.[15] Moreover, the

---

N.Y. U.C.C. § 9-319.

[13]     Under New York law, a consignor holds a "purchase-money security interest" ("PMSI") in consigned property. N.Y. U.C.C. § 9-103; see also id. § 1-201(37) (definition of "security interest" "includes any interest of a consignor . . . in a transaction that is subject to Article 9"). Kraken argues that it had an "ownership interest" in the Botticelli at the commencement of the bankruptcy case, that the Botticelli therefore cannot be part of the bankruptcy estate, and thus the issue of the pre-petition ownership of the Botticelli should be decided by an arbitrator, per the Consignment Agreement. (See Kraken Br. 7, 17.) The Trustee concedes that Kraken is the owner of the Botticelli, (see Trustee Br. 11), but that does not end the inquiry because a consignee's creditors may nevertheless acquire an interest superior to the consignor's, as I will discuss momentarily, and because whether Kraken (having consigned the Botticelli without perfecting its security interest) or the consignee's creditors, in the person of the Trustee, has priority is a matter of bankruptcy law. Thus, the issue here is not the pre-petition ownership of the Botticelli. It is whether the Trustee's interest as a hypothetical judicial lien holder or assignee of the Bank's pre-petition lien is superior to Kraken's interest as a consignor.

     Whether Kraken had a prepetition "ownership interest" in the Botticelli under Jersey Law is immaterial to this appeal, although, as discussed below, the Bankruptcy Court did not abuse its discretion in selecting New York law to control. The Bankruptcy Court did not reach the merits on the question of whether the Trustee had a post-petition security interest superior to Kraken's. Discussion of these questions were included in the Bankruptcy Court's opinion, as they are here, to explain how – contrary to Kraken's claim that the Botticelli cannot be an asset of the bankruptcy estate because it was not a pre-petition asset of SOG – the Botticelli could become part of the bankruptcy estate and how the Trustee could obtain a security interest superior to Kraken's under New York law. See In re SOG, 453 B.R. at 113 n.4.

[14]     Article 9 of the U.C.C. does not apply if the consignor perfects its security interest. See N.Y. U.C.C. § 9-319(b).

[15]     The purpose of Section 9-319 is to "protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory." In re Valley Media, Inc., 279 B.R. 105, 125 (Bankr. D. Del. 2002). To a general creditor of SOG's such as the Bank,

consignee's interest is property of the bankruptcy estate under Section 541.[16] Here, if UCC

Section 9-319 applies, the Trustee, as a judicial lien creditor under Bankruptcy Code Section 544

and assignee of the Bank's pre-petition lien, could (because the Bank did file a financing

statement) have a security interest senior to that of Kraken (which did not file a financing

statement) and would be able to avoid Kraken's unperfected security interest under Section 544.

Because UCC Section 9-319 applies to consignments, its applicability turns on whether

the transaction is a consignment as defined in UCC Section 9-102(a)(20).[17] The parties seem to

agree that that determination in turn depends on whether SOG was generally known by creditors

---

which could base the amount of a loan on the inventory possessed by a consignee, consigned property appears to be property wholly owned by the consignee unless the consignor files a UCC-1 financing statement, which notifies creditors of the status of a consigned item.

[16]     While the parties have not provided case law on this point, it seems to me the most reasonable reading of the Bankruptcy Code and the UCC, *see Liebzeit v. FVTS Acquisition Co. (In re Wolverine Fire Apparatus Co. of Sherwood Mich.)*, 465 B.R. 808, 820 (Bankr. E.D. Wis. 2012) (interpreting state code provisions similar to the New York UCC), although again, this discussion is provided for example only and this issue is not on appeal.

[17]     This section provides:

"Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

(A) the merchant:

(i) deals in goods of that kind under a name other than the name of the person making delivery;

(ii) is not an auctioneer; and

(iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;

(B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;

(C) the goods are not consumer goods immediately before delivery; and

(D) the transaction does not create a security interest that secures an obligation.

N.Y. U.C.C. § 9-102(a)(20).

to be dealing in consigned goods.[18] If the Botticelli transaction was one to which UCC Section 9-319 applies, the Trustee's rights under Section 544 may be superior to Kraken's even though Kraken owns the painting.

With respect to the arbitration question, "[c]laims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989); *see In re Hagerstown*, 277 B.R. at 206 ("A trustee in bankruptcy wears two hats. . . . Section 544(b) . . . puts the trustee in the creditors' shoes . . . ."). "The Supreme Court has made it clear that it is the *parties* to an arbitration agreement who are bound by it and whose intentions must be carried out. Thus there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." *Hays*, 885 F.2d at 1155 (emphasis in original); *see also In re Bethlehem Steel Corp.*, 390 B.R. at 791-92 ("Claims that are derivative of a debtor's rights may be subject to arbitration. Claims that belong exclusively to a trustee or debtor in possession belong to creditors who were not parties to the arbitration agreement and, therefore, are not subject to arbitration."). Thus, a trustee's claims asserted as a lien creditor under Section 544, as well as

---

[18]     The Bankruptcy Court in subsequent proceedings will have to determine which party bears the burden of proof on that issue, *see French Design Jewelry, Inc. v. Downey Creations, LLC (In re Downey Creations, LLC)*, 414 B.R. 463, 467-72 (Bankr. S.D. Ind. 2009) (noting confusion among different courts as to which party bears the burden of proof and concluding burden fell on consignor); *In re Valley Media*, 279 B.R. at 124 (burden falls on consignor), weigh the evidence, and, conceivably, consider whether the Bank had actual knowledge as to SOG taking the Botticelli on consignment and if so, whether such knowledge would affect the Trustee's priority vis-à-vis Kraken, *see In re Valley Media*, 279 B.R. at 125 n.36 (noting some courts have held that an individual creditor of consignee with actual knowledge of consignment agreement does not need protection from secret liens); *Atg Aerospace, Inc. v. High-Line Aviation Ltd. (In re High-Line Aviation, Inc.)*, 149 B.R. 730, 737 (Bankr. N.D. Ga. 1992) (creditor's actual knowledge of consignment prevented creditor from asserting priority interest in consigned good because creditor could not have been misled about status of consigned goods when it extended credit to consignee). The Bank obviously knew, from subsection (b) in the definition of Eligible Inventory and from subsection (ix) of the definition of Permitted Liens, that SOG held some art on consignment. Whether it knew the Botticelli was a consigned item, and what effect such knowledge (if proven) would have on the priority of the liens, is a matter that can be considered by the Bankruptcy Court in further proceedings.

assignee of a creditor's liens, are not subject to a pre-petition agreement between the debtor and another party to arbitrate. *See Hays*, 885 F.2d at 1155; *In re Hagerstown*, 277 B.R. at 206-08. In other words, because the Trustee is not standing in SOG's shoes with respect to Kraken – he is standing in his own shoes under Section 544, in the Bank's shoes, or both – he is not bound to arbitrate, as SOG would have been.

Even though this dispute arose by way of Kraken's motion to lift the bankruptcy stay in order to pursue arbitration and the pre-petition status of the Botticelli is not governed by bankruptcy law, the Trustee is asserting its rights as a creditor, either as assignee of the Bank's Prepetition Lien or under Section 544.[19] The issue Kraken seeks to arbitrate – whether the Botticelli is an estate asset, and who has rights to it – is not simply an issue between Kraken and SOG. As described above, the Trustee as creditor (under Section 544 or as assignee of the Bank's lien) can have rights to the painting even though Kraken concededly owns it. Thus, the issue is not one arising under the contract between Kraken and SOG. Because the dispute does not arise under the contract and is not a dispute between the parties to the contract, and because the Trustee does not stand in the shoes of a party to the contract, the Bankruptcy Court was correct in determining that the Trustee was not bound by the arbitration clause in the contract. *See In re SOG*, 453 B.R. at 128.

### 2.  Balance of Bankruptcy and Arbitration Policies

Even if the Trustee were bound by the arbitration clause, the Bankruptcy Court did not err in denying arbitration due the conflict between arbitration and the policy of the Bankruptcy Code.

---

[19]      It seems irrelevant whether the issue arose by way of Kraken's motion to lift the stay or another way, such as via the Trustee's motion to sell the painting. Regardless of how the issue is teed up, determination of the Trustee's rights vis-à-vis Kraken will be required.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, "requires a federal court to enforce an arbitration agreement and stay litigation that contravenes it." *In re Hagerstown Fiber Ltd.*, 277 B.R. at 197 (citing 9 U.S.C. §§ 2-3); *see also Genesco*, 815 F.2d at 844 ("[B]y its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). Disputes involving the FAA and the Bankruptcy Code, like the one here, often "present conflicts of near polar extremes:  bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach towards dispute resolution." *Hill*, 436 F.3d at 108 (internal quotation marks omitted). A bankruptcy court, for instance, has "broad, well-established powers . . . to preserve the integrity of the reorganization process," including the authority to "'issue *any* order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *In re U.S. Lines*, 197 F.3d at 640 (emphasis in original) (quoting 11 U.S.C. § 105(a)). Moreover, the automatic stay under Bankruptcy Code Section 362, "is broad, staying all proceedings, including arbitration." *Id.* (internal quotation marks omitted). "In the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *Id.* at 639.

Whether a bankruptcy court may deny arbitration based on a weighing of arbitration and bankruptcy policy depends on whether the proceeding at issue is core or not core under the Bankruptcy Code, a distinction on which I will elaborate shortly. As to core proceedings, if the bankruptcy court "has properly considered the conflicting policies [between the Bankruptcy Code and federal arbitration law, a reviewing court will] acknowledge its exercise of discretion and show due deference to its determination that arbitration will seriously jeopardize a particular

core bankruptcy proceeding." *Id.* at 641. But a bankruptcy court "will not have discretion to override an arbitration agreement unless it finds that the [core] proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the [FAA] or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code." *Hill*, 436 F.3d at 108. As to non-core proceedings, bankruptcy courts usually do not have the discretion to refuse to compel arbitration, as "the strong national policy favoring the enforcement of arbitration agreements," *see Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (internal quotation marks omitted), generally trumps "the lesser interest of bankruptcy courts in adjudicating non-core proceedings that could otherwise be arbitrated," *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir. 2000).

    i. <u>Whether Determination of Estate Property Under Section 541 Is Core</u>

   Bankruptcy proceedings are either "core" or not core. District courts, which have "original and exclusive jurisdiction of all cases" under the Bankruptcy Code, 28 U.S.C. § 1334(a), may refer all proceedings to bankruptcy judges of their district, *Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011). In this district, all cases are automatically referred by standing order. (*See* No. 12-MC-32, Doc. 1). The Bankruptcy Code divides bankruptcy proceedings into three categories: (1) those "'arising under'" Title 11, (2) those "'arising in'" Title 11 cases, and (3) those "'related to'" Title 11 cases. *Stern*, 131 S. Ct. at 2603 (quoting 28 U.S.C. § 157). The first two categories constitute "core" proceedings. *Id.* at 2605 ("[C]ore proceedings are those that arise in a bankruptcy case or under Title 11."). Proceedings merely related to Title 11 cases are not core. *Id.*; *see* 28 U.S.C. § 157(c)(1) (instructing bankruptcy judges to submit proposed findings in "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11"). Bankruptcy courts may hear and enter final judgments in core proceedings, *see*

28 U.S.C. § 157(b)(1), but may only submit proposed findings of facts and conclusions of law to the referring district court in non-core proceedings, *see id.* § 157(c)(1); *Stern*, 131 S. Ct. at 2604.

The distinction between core and non-core proceedings was first articulated in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion). *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228-29 (2d Cir. 2002). In *Marathon*, the Court considered the constitutionality of bankruptcy court jurisdiction under Article III of the Constitution, noting that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Marathon*, 458 U.S. at 71. The *Marathon* Court established only, however, "that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985) (citing *Marathon*, 458 U.S. at 84). The "Court was unable to agree on the precise scope and nature of Article III's limitations." *Id.*; *see also Stern*, 131 S. Ct. at 2610 (majority of *Marathon* Court did not agree on scope of "public rights" exception to Article III, but found that it did not encompass state law claim at issue, and thus bankruptcy court could not resolve the claim).

In response to *Marathon*, Congress codified the core/non-core distinction in 28 U.S.C. § 157, and in making this distinction, "Congress realized that the bankruptcy court's jurisdictional reach was essential to the efficient administration of bankruptcy proceedings and intended that the 'core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in *Marathon*." *In re Petrie Retail Inc.*, 304 F.3d at 229 (internal quotation marks omitted). Therefore, courts in this circuit "interpret[] 'core proceedings' as broadly as

permitted under the Constitution." *Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 448 F. App'x 134, 136 (2d Cir. 2011) (summary order) (internal quotation marks omitted); *see Ben Cooper, Inc. v. Ins. Co. of the State of Pa. (In re Ben Cooper, Inc.)*, 896 F.2d 1394, 1398-99 (2d Cir. 1990) ("[T]he legislative history of [§ 157] indicates that Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits.") (alteration in original) (internal quotation marks omitted). Moreover, Section 157 provides that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law," 28 U.S.C. § 157(b)(3), which demonstrates "Congress' intent that bankruptcy courts are not precluded from adjudicating state-law claims when such claims are at the heart of the administration of the bankrupt estate." *In re Ben Cooper*, 896 F.2d at 1399.

Section 157 lists sixteen core proceedings including, in relevant part as relied upon by the Bankruptcy Court in this case, "allowance or disallowance of claims against the estate," "determinations of the validity, extent, or priority of liens," and "other proceedings affecting the liquidation of the assets of the estate." 28 U.S.C. § 157(b)(2)(B), (K), (O); *see In re SOG*, 453 B.R. at 114, 123. This list does not include determination of what constitutes the bankruptcy estate under Bankruptcy Code Section 541, but the list is not exhaustive. *See* 28 U.S.C. § 157(b)(2). Core proceedings "encompass both claims predicated on a right created by title 11 and claims that have no existence outside bankruptcy." *Shiboleth v. Yerushalmi*, 412 B.R. 113, 116 (S.D.N.Y. 2009). Specifically, "arising under" proceedings consist of "any causes of action created by Title 11," *Liddle & Robinson, L.L.P. v. Daley (In re Daley)*, 224 B.R. 307, 311 (Bankr. S.D.N.Y. 1998), meaning "any matter under which a claim is made under a provision of [T]itle 11," *Binder & Binder, P.C. v. Finnie (In re Finnie)*, No. 05-CV-3652, 2007 WL 1574294,

at *10 (Bankr. S.D.N.Y. May 29, 2007) (internal quotation marks omitted).  "Arising in"

proceedings "arise only in bankruptcy cases"; they are "matters not based on any right expressly

created by Title 11, but that would have no existence outside of the bankruptcy." *Id.*

      In contrast, non-core "related-to" proceedings "involve[] the adjudication of state-created

private rights, such as the right to recover contract damages, and the outcome of the proceeding

could affect the estate being administered in bankruptcy." *Shiboleth*, 412 B.R. at 116-17

(internal quotation marks omitted).  More specifically, a related-to proceeding is one that "'might

have any "conceivable effect" on the bankruptcy estate,'" *In re Finnie*, 2007 WL 1574294, at

*11 (quoting *Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d

110, 114 (2d Cir. 1992)), meaning that the outcome of the proceeding could "'alter the debtor's

rights, liabilities, options, or freedom of action (either positively or negatively) and which in any

way impacts upon the handling and administration of the bankrupt estate,'" *Back v. LTV Corp.*

*(In re Chateaugay Corp.)*, 213 B.R. 633, 638 (S.D.N.Y.1997) (quoting *Bond St. Assocs., Ltd. v.*

*Ames Dep't Stores, Inc.*, 174 B.R. 28, 32 (S.D.N.Y. 1994)); *see also Interconnect Tel. Servs.,*

*Inc. v. Farren*, 59 B.R. 397, 400 (S.D.N.Y. 1986) ("Non-core proceedings consist of those claims

arising under traditional state law which must be determined by state law.  They are those civil

proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district

court or state court.") (internal citation and quotation marks omitted).

      The parties do not cite Second Circuit case law addressing whether the determination of

what constitutes the bankruptcy estate is a core proceeding, but courts outside this circuit have

held that it is, although there does not seem to be a consensus on the basis for such a

determination. *See Williams v. McGreevey (In re Touch Am. Holdings, Inc.)*, 401 B.R. 107, 117

(Bankr. D. Del. 2009) ("Various courts have concluded that matters requiring a declaration of

whether certain property comes within the definition of 'property of the estate' as set forth in Bankruptcy Code § 541 are core proceedings.") (collecting cases); *Brown v. Fox Broad. Co. (In re Cox)*, 433 B.R. 911, 920 (Bankr. N.D. Ga. 2010) ("It is generally recognized that a proceeding to determine what constitutes property of the estate pursuant to 11 U.S.C. § 541 is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E), and that, whenever there is a dispute regarding whether property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court.") (alterations, internal citations, and internal quotation marks omitted).[20] These cases hold that the Section 541 determination is a core proceeding "even though such a determination may rest upon interpretation of state law." *Koken v. Reliance Grp. Holdings, Inc. (In re Reliance Grp. Holdings, Inc.)*, 273 B.R. 374, 395 (Bankr. E.D. Pa. 2002); *see also Pension Benefit Guar. Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 138 B.R. 442, 445 (Bankr. D. Del. 1992) ("The determination of each party's interest in the property is made by reference to the applicable state's law, [*Butner*, 440 U.S. at 54-56 (1979)], and the Bankruptcy Code determines whether that particular interest may properly be included in the property of the estate. The determination of the property of the estate is one of the core proceedings arising under title 11."); *Johnson v. Fisher (In re Fisher)*, 67 B.R. 666, 668 (Bankr. D. Colo. 1986) ("The determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court. However, in making such a determination the bankruptcy court must turn to state law to define such property rights.") (internal citations omitted).

At least one court outside of this circuit has reached a different conclusion. *Green v. FDIC (In re Tamalpais Bancorp)*, 451 B.R. 6 (N.D. Cal. 2011), involved a declaratory judgment proceeding brought in the bankruptcy court regarding whether a debtor's tax refunds were

---

[20]    28 U.S.C. § 157(b)(2)(A) and (E) provide that "matters concerning the administration of the estate" and "orders to turn over property of the estate" are core proceedings.

property of the bankruptcy estate pursuant to a 2005 tax sharing agreement. *Id.* at 8. In holding that the claim at issue was non-core, the district court distinguished between an action in which resolution of a claim hinges on interpretation of Section 541 of the Bankruptcy Code – core – and one in which the "bankruptcy-related question of whether 11 U.S.C. § 541(a) includes the [disputed property] in Debtor's bankruptcy estate is only secondary to that threshold inquiry [of to whom the property belongs] under contract law" – not core. *Id.* at 11. The court rejected "numerous bankruptcy court decisions for the proposition that determination of the ownership of property, when performed in the context of a bankruptcy proceeding, is a core proceeding," instead interpreting binding Ninth Circuit precedent to control the outcome. *Id.*; *see also id.* at 10-11 ("[W]hile a claim arising from a post-petition contract regarding the property of the bankruptcy estate is a core proceeding, a claim arising from a pre-petition contract is a non-core proceeding even if the debtor is a party to the contract at issue.") (citing *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131-33 (9th Cir. 2010); *Harris v. Wittman (In re Harris)*, 590 F.3d 730, 740-41 (9th Cir. 2009)); *see also Schmidt v. Klein Bank (In re Schmidt)*, 453 B.R. 346, 348, 351 (B.A.P. 8th Cir. 2011) (replevin actions filed in state court and removed to bankruptcy court existed under state law regardless of the bankruptcy filing, and thus determination was not core).

The Bankruptcy Court below did not explicitly state that the determination of what property makes up a bankruptcy estate was core, but instead held it had "jurisdiction to determine the priority of interests in the Botticelli, a core matter pursuant to 28 U.S.C. § 157(b)(2)(B), (K) and (O)." *In re SOG*, 453 B.R. at 123. The court rested its holding on efficiency grounds:

> Determination of whether property was property of the debtor is more efficiently
> determined as one element of an action by the trustee to avoid an unperfected

> security interest pursuant to 11 U.S.C. § 544(a). Judicial economy is better
> served by letting the bankruptcy court determine whether Debtor had a
> prepetition interest in the Botticelli, as part of a single legal proceeding – the
> determination of whether the Trust may avoid any unperfected security interest
> of Kraken.

*Id.* at 123-24.

I find that the determination of what property constitutes the bankruptcy estate is a core

proceeding, at least in this case and probably in most, if not all, cases.  A bankruptcy estate is a

construct of Section 541, and thus a proceeding to determine the bounds of the estate "arises

under" Title 11, *see In re Reliance Grp.*, 273 B.R. at 394-95 (issues at heart of state court actions

"arise under" Title 11 by requiring determination of whether assets in dispute are property of

bankruptcy estate as defined in Section 541), or at least is one that has no existence outside

bankruptcy, and thus is core as an "arising in" proceeding, *see BankUnited Fin. Corp. v. FDIC

(In re BankUnited Fin. Corp.)*, 462 B.R. 885, 893-94 (Bankr. S.D. Fla. 2011) ("[W]hat is or is

not property of a bankruptcy estate is an issue that stems from the bankruptcy itself, one that can

only arise in a bankruptcy proceeding, since the concept of what is property of a bankruptcy

estate does not exist outside of a bankruptcy case.") (internal citations omitted).

Further, Kraken has filed a proof of claim in this case, thus triggering core jurisdiction

under 28 U.S.C. § 157(b)(2)(B) for "allowance or disallowance of claims against the estate."  *See

Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191-92 (2d Cir. 2003) (party opposing core

jurisdiction filed proof of claim, thus creating core jurisdiction under 28 U.S.C. § 157(b)(2)(B),

in what would otherwise have been non-core proceeding) (collecting cases); *S.G. Phillips

Constructors, Inc. v. City of Burlington, Vt. (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702,

705 (2d Cir. 1995) ("[W]hen a creditor files a proof of claim, the bankruptcy court has core

jurisdiction to determine that claim, even if it was a prepetition contract claim arising under state

law. . . . The sole fact that the [creditor's] state law claim was filed before its petition has no

bearing on whether the claim is characterized as core or non-core when a proof of claim has been filed.")  Thus, even if the Bankruptcy Court did not have "arising under" or "arising in" core jurisdiction because the pre-petition rights of the parties are the primary issue, and that issue may be one of state law and not interpretation of Section 541, *see In re Tamalpais*, 451 B.R. at *11, it has core jurisdiction over that issue as part of the determination of Kraken's claim, *cf. In re BankUnited*, 462 B.R. at 895 n.25 ("[T]he district court in *Tamalpais* withdrew its . . . ruling of no jurisdiction because the court learned, after issuing its opinion, that the [creditor] in that case did file a proof of claim.").

Accordingly, because the dispute was a core proceeding, the Bankruptcy Court had discretion to refuse to allow arbitration on policy grounds, and I review the Bankruptcy Court's denial of arbitration (as I would any motion to lift the stay) for abuse of discretion.

ii.  Balance of Policies

The Bankruptcy court did not abuse its discretion in finding that the interests of the Bankruptcy Code – "to facilitate reorganization of debt and assets, allow repayment of creditors, and centralize disputes in a single forum" – outweighed the competing interests of the FAA – that Kraken, a foreign entity, wished to protect itself from unknown laws and that the parties might have freely negotiated an arbitration clause as a necessary part of their business relationship. *In re SOG*, 453 B.R. at 129; *cf. In re Bethlehem Steel*, 390 B.R. at 793-95 (exercising discretion to deny arbitration because of "severe conflict" with bankruptcy policy). Granting Kraken's motion to lift the stay to allow arbitration as to entitlement to the Botticelli would necessarily jeopardize these objectives of the Bankruptcy Code. *See Musso*, 468 F.3d at 104 ("The estate created by section 541 is protected from the piecemeal reach of creditors by section 362, which imposes an automatic stay on all actions and proceedings that may affect the debtor's property. 'It is this central aggregation of property that promotes the effectuation of the

fundamental purposes of the Bankruptcy Code: the breathing room given to a debtor that attempts to make a fresh start, and the equality of distribution of assets among similarly situated creditors . . . .") (alteration in original) (internal citation omitted) (quoting 5 Collier on Bankruptcy ¶ 541.01 (15th ed. 2005)); *In re Petrie*, 304 F.3d at 229 (bankruptcy court's jurisdictional reach is "essential to the efficient administration of bankruptcy proceedings") (internal quotation marks omitted).  I agree with the Bankruptcy Court's assessment that this "case presents a classic example of the compelling policy in support of a uniform Bankruptcy Code."  If every dispute as to whether property was part of the bankruptcy estate or could be reached by the debtor's creditors were sent to arbitration pursuant to a pre-petition arbitration agreement, unreasonable delay, costs, and duplication of effort would result for all parties involved in the bankruptcy as well as the courts.

In line with the above discussion, the Bankruptcy Court found that *Sonnax* counseled against lifting the stay:  "Arbitrating [pre-petition ownership of the Botticelli] in Jersey, then litigating [priority under Section 544] in bankruptcy court would lead to a multiplicity of proceedings, undermine judicial economy, and decentralize disputes, all of which militate against finding cause for relief from the stay."  *In re SOG*, 453 B.R. at 129 (citing *In re Sonnax*, 907 F.2d at 1286).  In addition to the *Sonnax* factors to which the Bankruptcy Court alluded – judicial economy (factor ten) and that lifting stay would result only in partial resolution of the issues (factor one) – I find other factors also support the Bankruptcy Court's decision.  Arbitration would interfere with the bankruptcy case (factor two) and prejudice the interests of SOG's creditors, who may have an interest in the Botticelli (factor seven).  Kraken's success in arbitration could result in SOG avoiding what might be a valid judicial lien (factor nine).  Finally, the balance of the harms favors not lifting the stay (factor twelve).  While Kraken might

be harmed by denial of arbitration, lifting the stay will result in delay of resolution of the fate of Botticelli, which will harm all of SOG's creditors.

For these reasons, I do not find any legal or factual errors in the Bankruptcy Court's decision, nor do I find the Bankruptcy Court's refusal to lift the stay to allow arbitration to be an abuse of discretion. Accordingly, the Bankruptcy Court's denial of arbitration is affirmed.

### C. Choice of Law

I now turn to the question of what law the Bankruptcy Court should apply. Kraken, applying both federal and New York choice of law principles, argues that the Bankruptcy Court erred in disregarding the choice of law clause in the Consignment Agreement, which indicates that Jersey Law should control. (*See* Kraken Br. 13-19; Consignment Agreement 2.)

I need not determine whether the Bankruptcy Court should have applied federal or New York choice-of-law rules because both apply "the law of the jurisdiction having the greatest interest in the litigation." *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 350 (2d Cir. 1992) (determining which forum's law will supply substantive rule for determining whether particular property is part of a debtor's estate); *see also Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723, 726 (2d Cir. 1991) (federal and New York choice-of-law rules "invoke[] similar considerations"); *Steinberg v. Sherman*, No. 07-CV-1001, 2008 WL 1968297, at *3 & n.2 (S.D.N.Y. 2008) (federal and New York choice-of-law rules would "compel the same conclusion"); *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590-91 & n.7 (S.D.N.Y. 2001) (no significant difference in between federal and New York (also known as "center of gravity test") choice-of-law rules), *aff'd*, 306 F.3d 17 (2d Cir. 2002). In contract cases, New York courts consider a "spectrum of significant contacts," *Metro–Goldwyn–Mayer Home Entm't v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 322 B.R. 238, 243 (Bankr. S.D.N.Y. 2005), such as "'the place of contracting,

negotiation and performance; the location of the subject matter of the contract; and the domicile

of the contracting parties,'" *Beth Israel Med Ctr. v. Horizon Blue Cross & Blue Shield of N.J.,*

*Inc.*, 448 F.3d 573, 583 (2d Cir. 2006) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 227

(1993)); *see also In re Koreag*, 961 F.2d at 351 (looking to parties' places of incorporation,

principal places of business, place of performance, location of the disputed property, New York's

interest as world financial center in transactions giving rise to litigation, and foreign interest of

liquidator who was administering bankruptcy estate).  Courts may also consider "public policy

'where the policies underlying conflicting laws in a . . . dispute are readily identifiable and

reflect strong governmental interests.'" *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108

F.3d 1531, 1539 (2d Cir. 1997) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d at 226)).  A

bankruptcy court's weighing of different forums' interests is reviewed for abuse of discretion.

*See Maxwell Comm'cn Corp. v. Societe General PLC (In re Maxwell Comm'cn Corp.)*, 186 B.R.

807, 822 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir. 1996).

        Here, the Bankruptcy Court did not abuse its discretion in selecting New York law using

an interest-in-the-litigation analysis.  *See In re SOG*, 453 B.R. at 131 n.12.[21]  It correctly

disregarded the Jersey choice-of-law-clause in the Consignment Agreement because that

Agreement is not binding on the Trustee, *see id.* at 120, for the reasons stated above.  Moreover,

in choosing to apply New York law, the Bankruptcy Court noted that the Botticelli is located in

New York, the Bank's financing statements were filed with New York, and "application of New

York law would further the goals of [UCC] Article 9:  predictability of transactions and the

---

[21]        While the Bankruptcy Court explicitly stated elsewhere in its opinion that the UCC controls the effect of
Kraken's failure to file a financing statement, and thus whether the Botticelli was property of the bankruptcy estate,
*see In re SOG*, 453 B.R. at 112, and cited to the interest analysis factors in summarizing the holding of another case,
I assume that the Bankruptcy Court considered these factors in choosing to apply New York law.  In any event, I
would make the same determination *de novo*.

provision of notice to prospective creditors." *Id.* at 131 n.12.  I also note that at all times, the

debtor was located in New York and its bankruptcy case was initiated there.  While there are

countervailing considerations, such as Jersey being Kraken's principal place of business and

Kraken's clear preference for Jersey law to apply to disputes regarding the Consignment

Agreement, I find the Bankruptcy Court's decision to apply New York law reasonable and not an

abuse of discretion.

      Kraken contends that even if New York law does apply, the UCC in turn dictates that

substantive Jersey law should apply because "when a transaction bears a reasonable relation to

this state and also to another state or nation the parties may agree that the law either of this state

or of such other state or nation shall govern their rights and duties."  N.Y. U.C.C. § 1-105(1).

(*See* Kraken Br. 16.)  Again, however, contrary to Kraken's argument, the Trustee is not bound

by the Consignment Agreement, and thus this provision is inapplicable, as the Trustee and Bank

did not agree to the choice-of-law clause.  Thus, "[f]ailing such agreement[, the UCC] applies to

transactions bearing an appropriate relation to this state." *Id.*  For the same reasons that New

York law applies as a result of the interest-of-the-litigation analysis – namely, because the

Botticelli and debtor are located in New York, the financing statements were filed in New York,

and the State's interests in furthering the goals of the UCC – the transaction at issue bears an

appropriate relation to New York, and thus the UCC controls. *See* N.Y. U.C.C. § 1-105 cmt.3

("Where a transaction has significant contacts with [New York] and also with other jurisdictions,

the question what relation is 'appropriate' is left to judicial decision."); *MWL Braz. Rodas &*

*Eixos LTDA v. K-IV Enters. LLC*, 661 F. Supp. 2d 419, 427-28 (S.D.N.Y. 2009) ("'Federal

courts interpreting ["appropriate relation"] in New York and other states have taken into account

the residences of the parties, the locations of the negotiations, the place of purchase of the goods,

and the physical location of the goods at issue.'") (quoting *Zhong Ya Chem. (USA) Ltd. v. Indus. Chem. Trading, Inc.*, No. 99-CV-12174, 2001 WL 69438, at *3 (S.D.N.Y. Jan. 26, 2001)).

Moreover, where UCC Sections 9-301 to 9-307 – which govern perfection, the effect of perfection or non-perfection, and the priority of security interests – "specif[y] the applicable law, [those] provision[s] govern[] and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules)." N.Y. U.C.C. § 1-105(2).  UCC Section 9-301 states that perfection and priority issues are governed by the law of the state where the debtor or collateral is located.  *See* N.Y. U.C.C. § 9-301(a)-(b).  Thus, even if the Trustee were bound by the choice-of-law clause, that clause would yield to New York law and the UCC would provide the substantive rule of decision.

Kraken argues that the law governing perfection of security interests is not relevant to the question of whether the Botticelli ever was property of the bankruptcy estate.  (*See* Kraken Br. 17.)  As discussed above, however, UCC Section 9-319 is clear that a creditor of a debtor could obtain a security interest in a consignment item senior to that of a consignee who does not file a financing statement.  *See* N.Y. U.C.C. § 9-319 cmt. 2 (example 1).  Thus the law governing perfection of security interests is relevant to this dispute.  Specifically, the Bankruptcy Court will determine whether the Botticelli became part of the bankruptcy estate in determining the effect of N.Y. U.C.C. § 9-319 and the Consignment Agreement (for example, if the Consignment Agreement was still valid at the relevant time and whether the Bank obtained a lien on the Botticelli because it was Collateral).

Accordingly, I find no legal error or abuse of discretion in the Bankruptcy Court's decision not to enforce against the Trustee the choice-of-law clause in the Consignment Agreement.

## III.   **Conclusion**

The Court well understands why Kraken is perturbed, even outraged, by the idea that SOG's creditors[22] may enjoy the proceeds from the sale of a valuable painting concededly owned by Kraken.  The law of the state in which Kraken consigned the painting, however, allows for such an outcome where the consignor does not protect itself by filing a financing statement giving notice of the consignment to the consignee's creditors.  Whether that result will obtain here remains to be seen.  But while Kraken may have thought it was protecting itself vis-à-vis SOG by the arbitration and choice-of-law clauses in the Consignment Agreement, it did not protect itself via those clauses when it came to SOG's creditors.  *Cf. In re Valley Media*, 279 B.R. at 125 ("Under these U.C.C. provisions [governing consignments], the court is not concerned with the rights between the consignor and consignee, but rather solely with the rights of the third party creditors of the consignee.")  The Bankruptcy Court correctly held that in sorting out the rights to the Botticelli as between Kraken and the Trustee, those clauses did not apply, arbitration was thus not appropriate, and the lifting of the stay to allow for arbitration was therefore not warranted.

For the foregoing reasons, the judgment of the United States Bankruptcy Court, dated August 1, 2011, is hereby AFFIRMED.  The Clerk of the Court is respectfully directed to docket this decision in, and terminate, the pending appeal, (Case No. 11-CV-6133).

**SO ORDERED.**

Dated: July 9, 2012
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[22]   These creditors would include Kraken, but only as one of presumably many unsecured creditors who will not be paid in full.